**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

| | |
|---|---|
| **ELIZABETH M. TRICE,** | |
| **Plaintiff,** | **6:02-CV-0450** |
| vs. | **(NAM)** |
| **MICHAEL J. ASTRUE[1],** | |
| **Commissioner of Social Security,** | |
| **Defendant.** | |

_____

**APPEARANCES:**                                                  **OF COUNSEL:**

Office of Daniel L. Welch                                         Daniel L. Welch
11 North Street
Marcellus, New York 13108
*Attorney for Plaintiff*

Glenn T. Suddaby                                                  William H. Pease
United States Attorney for the                                    Assistant United States Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198
*Attorney for Defendant*

**Norman A. Mordue, Chief U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

**I.     INTRODUCTION**

Plaintiff Elizabeth M. Trice brings the above-captioned action pursuant to 42 U.S.C. §

405(g) and 1383(c)(3) of the Social Security Act, seeking review of the Commissioner of Social

Security's decision based on the Administrative Law Judge's decision dated March 15, 2001,

---

[1] The complaint named Jo Anne B. Barnhart as Defendant, then the Commissioner of Social Security. On February 12, 2007, Michael J. Astrue assumed that position. Therefore, he shall be substituted as the named Defendant pursuant to Fed. R. Civ. P. 25(d)(1).

which denied her November 3, 1999, application for Supplemental Security Income ("SSI") benefits.

## II.     FACTUAL BACKGROUND

### A.     Plaintiff's Testimony

Plaintiff was born in February 1973.  (Administrative Transcript ("T") at 109.)  She attended school for nine years and then earned her GED.  (T. at 39.)  She worked sporadically in the late 1980s and early 1990s as a cashier at K-Mart and various fast-food restaurants.  (T. at 153.)  Plaintiff testified that she tried to work at a sit-down job "doing the cable parts" for two days in 2000, but stopped because her "body wouldn't allow it.  It was just hurting too bad."  (T. at 44.)

Regarding her mental condition, plaintiff testified that she suffers from depression and kleptomania.  (T. at 50.)  She began stealing from her family when she was eight or nine years old.  (T. at 50.)  She estimated that, in total, she had been fired from three jobs for stealing.  (T. at 54.)  At other jobs, she stole but was not caught.  (T. at 54.)  She has been incarcerated several times.  (T. at 50.) Plaintiff testified that she takes Zoloft for her depression and to "slow down" her compulsion to steal.  (T. at 41, 51.)  It was effective at first, but over time she became "immune to it."  (T. at 41-42.)

Regarding her physical condition, plaintiff testified that, as a result of childhood scoliosis and two car accidents in 1997,  her "neck tingles all the way down the back, the lower back."  (T. at 45-46.)  She estimated that she could stand for ten minutes and sit for twenty minutes without having severe pain.  (T. at 47-48.)  At the time of the hearing, plaintiff was taking only Tylenol and Advil for her pain because she was pregnant.  (T. at 45.)  She testified that they did not help. (T. at 45.)

Plaintiff testified that she spent a typical day "sitting around the house or going to the mall." (T. at 43.) Plaintiff testified that she sometimes does housework (T. at 43.) She testified that she shops by dividing her shopping into smaller trips. (T. at 43.) However, later in her testimony she stated that "I don't do my shopping" because "[a] gallon of milk is real heavy to me." (T. at 49.) Plaintiff stated that she is not able to do laundry because she cannot climb up and down the stairs. (T. at 48.) Plaintiff testified that she is able to drive three to four times per week. (T. at 43-44.)

### B. Records Regarding Plaintiff's Mental Condition

According to plaintiff's medical records, she treated her mental condition with Thomas Falci, M.D., from October 1996 through March 1999. (T. at 280-296.) Dr. Falci diagnosed plaintiff with kleptomania and obsessive compulsive disorder and prescribed Paxil. (T. at 280.) On November 1, 1999, plaintiff returned to Dr. Falci "after a long absence." (T. at 466-467.) Plaintiff reported that she had been in jail for eight months. She told Dr. Falci that she "thinks about stealing ... all the time." (T. at 466.) While in jail, she was prescribed Seroquel, Prozac and Desyrel. Plaintiff told Dr. Falci that the medications "helped her sleep and she felt calmer, but she was still (stealing) and obsessing." She stated that Paxil "helped her best in terms of decreasing the (stealing) although she did still do some of it on it. It greatly reduced the (stealing) but it was less helpful in terms of sleep and mood." (T. at 466.) Dr. Falci prescribed Paxil and Seroquel. (T. at 467.) Noting that plaintiff did not currently have Medicaid (T. at 466), Dr. Falci gave her a sample 28 day supply of Paxil. (T. at 467.) He stated that he would see her again in four weeks "and hopefully we will either have more samples or she will have Medicaid." (T. at 467.)

On December 1, 1999, Dr. Falci and Ron Lopez, CSWR, reported to the agency that

plaintiff "always presented neatly groomed and dressed" and that her "mood (was) slightly depressed, with anxiety, calm when in compliance with medication ... Attention span and concentration fair. Remote memory good, recent fair to poor. No psychotic or delusional material. Insight and judgement (sic) are poor. She is capable of doing limited work." Dr. Falci and Mr. Lopez did not define what they meant by "limited work." (T. at 280.)

On February 8, 2000, Dennis Noia, Ph.D, performed a consultative psychiatric evaluation. (T. at 440-443.) Dr. Noia noted that plaintiff:

> states she was seeing Dr. Falci at Syracuse Community Health Center and she was prescribed various medications, including Prozac and Paxil. She left this examiner with the impression that she is in treatment presently, but upon further questioning, it became clear that she is currently not on any medications, and it has been at least a few months since she has been on any medications. Additionally, this examiner learned that she was incarcerated over time for, she states, at least 5 years and was released from prison in September 1999. When asked about her stating that she was seeing Dr. Falci every 2 weeks to every month from 1996, she became silent. It should be noted that Ms. Trice was essentially uncooperative throughout the examination, and appeared to be extremely depressed. However, her overall appearance and lack of forthcoming regarding her past raises suspicion about malingering.

(T. at 440.) Regarding plaintiff's appearance, Dr. Noia noted that "her mode of dress, clothing, hair style, and overall personal maintenance was of a very high degree and very rarely found on an individual who is as depressed as she was reporting to be." (T. at 441.) Dr. Noia's medical source statement was that:

> it is difficult to assess what Ms. Trice is able to do and what she is not able to do given this examiner's present suspicions that she may be malingering. Therefore, rather than making a definitive statement about her abilities and rather than stating whether results of this examination are consistent with any allegations, at the present time this examiner believes that malingering needs to be ruled out ... It is recommended that if Ms. Trice is indeed as depressed as she is presenting to be, (she) should be involved in intensive psychiatric and

4

> psychological treatment and on medications to help with the depression. It is also recommended that additional information be gathered from whatever source is available to help complete a picture of Ms. Trice's overall functioning at the present time. It may be helpful to administer an intelligence evaluation to ascertain whether or not malingering may be present in that if she performs extremely poorly relative to her adaptive skills and overall presentation, the likelihood of malingering increases.

(T. at 442-443.)

In a Psychiatric Review Technique form dated February 17, 2000, agency medical consultant Carlos Gieseken, M.D., opined that a mental residual functional capacity ("RFC") assessment was necessary because "a severe impairment is present which does not meet or equal a listed impairment." (T. at 457.) Dr. Gieseken found that plaintiff has no limitations on activities of daily living, slight difficulties in maintaining social functioning, seldom suffers from deficiencies of concentration, persistence or pace, and has never had an episode of deterioration or decompensation in a work or work-like setting. (T. at 464.)

Dr. Gieseken then signed a Mental RFC Assessment form. He opined that plaintiff suffers from moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (T. at 452-453.)

On July 24, 2000, plaintiff saw S. Fernando, M.D., for a follow-up evaluation[2] regarding her mental status. (T. at 471.) Plaintiff reported "that she has been experiencing anesthesia urge for stealing and she continued to steal but was not caught. .. She reports of compulsive stealing,

---

[2] Dr. Fernando practices at the same clinic as Dr. Falci and apparently replaced Dr. Falci as plaintiff's treating physician.

losing control, becoming impulsive and not able to resist. She had been treated with many medications and currently is receiving Seroquel and Paxil ... She had been taking Seroquel up to 500 mg when she was in jail and nothing helps her problem. She, also, feels depression, anxiety, losing interest and strongly preoccupied with her stealing habit. She was not treated with lithium in the past and she is medically stable." (T. at 471.) Dr. Fernando prescribed lithium and directed plaintiff to also continue taking her Paxil. (T. at 471.)

On October 13, 2000, plaintiff returned to Dr. Fernando. (T. at 472.) She reported that she had stopped taking Prozac due to her pregnancy. (T. at 472.) Plaintiff "wished to resume her antidepressant although she is aware that her pregnancy may be effected ... so she declined the antidepressant. When she believes that she requires it she will start medication for her depression in order to avoid further relapse ... She will start Zoloft 50 mg once a day." (T. at 472.) Dr. Fernando advised plaintiff to return in one week. (T. at 472.)

On October 19, 2000, plaintiff followed up with Dr. Fernando. (T. at 473.) She reported that she continued to feel anxious and depressed. (T. at 473.) She asked to continue her medication in order to avoid a relapse. (T. at 473.) Dr. Fernando stated that "[i]f she could avoid the medication at this time it may be beneficial. The patient will decide on this issue." (T. at 473.) Dr. Fernando directed plaintiff to continue therapy and return in eight weeks. (T. at 473.)

### C. Evidence Regarding Plaintiff's Physical Condition

Records regarding plaintiff's physical condition for the relevant time period are fairly limited[3]. On January 26, 2000, plaintiff was consultatively examined by Kalyani Ganesh, M.D. (T. at 438-439.) Dr. Ganesh terminated the examination without offering a medical source

---

[3] The administrative record contains voluminous records regarding Plaintiff's physical condition from 1983-1998. However, as discussed below, only the records dated on or after November 30, 1998, are relevant to Plaintiff's current SSI application.

6

statement due to plaintiff's poor cooperation and motivation. (T. at 439.)

On February 17, 2000, Sury Putcha, M.D., completed a Physical RFC Assessment form. (T. at 444-451.) Dr. Putcha found that plaintiff did not suffer from any physical limitations.

On June 15, 2000, plaintiff saw Kristen Graves, M.D. (T. at 468-470.) Plaintiff complained of pain in her knees, wrists, legs, back and neck. (T. at 468.) On examination, Dr. Graves found tenderness throughout plaintiff's trapezius muscles bilaterally and paraspinal muscle tenderness in the lumbar spine, but no point tenderness of the spine. (T. at 469.) Plaintiff was able to abduct her left arm only to 90 degrees. (T. at 469.) Plaintiff reported straight leg raise pain when lifting each leg to approximately 45 degrees. (T. at 469.) Plaintiff's reflexes were symmetric and her joints and wrists showed no erythema, swelling or tenderness. (T. at 469.) Dr. Graves prescribed Celebrex and referred plaintiff to physical therapy. (T. at 469.) She stated that she would "consider pain treatment referral when records and previous imaging studies have been obtained." (T. at 469.)

## III.    ADMINISTRATIVE LAW JUDGE'S DECISION

To be eligible for SSI benefits, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. § 1382c(a)(3)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the SSA bears the burden on the last step.

7

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted)).

In this case, the Administrative Law Judge ("ALJ") found at step one that plaintiff had not engaged in any substantial gainful activity for the pertinent period. (T. at 16, 20.) At step two, he found that plaintiff suffers from three "severe" impairments: spondylolisthesis, mild scoliotic curve, and mild degenerative changes around the right knee. (T. at 16, 20.) The ALJ found that plaintiff does not suffer from any "severe" mental impairments. (T. at 19.) At step three, the ALJ found that none of plaintiff's severe impairments meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulation No. 4. (T. at 17, 20.) The ALJ found that plaintiff's reports of pain were not credible and that plaintiff retains the RFC to perform light work. (T. at 20.) At step four, the ALJ found that plaintiff has no past relevant work. (T. at 19-20.) At step five, the ALJ did not elicit or apply testimony from a vocational expert. Rather, he consulted "the Grid[4]" and determined that plaintiff is not disabled. (T. at 20-21.)

The Appeals Council denied plaintiff's request for review, making the ALJ s decision the final decision of the Commissioner. (T. at 7-8.) This action followed.

## IV. DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the

---

[4] "In meeting [his] burden of proof on the fifth step of the sequential evaluation process . . . , the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2 . . . . The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability." *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (footnotes omitted): *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

8

factual findings are not supported by "substantial evidence" or when a decision is based on legal error. 42 U.S.C. § 405(g); *Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. As noted, the Court also reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

Plaintiff argues that the Commissioner's decision should be set aside because (1) the ALJ erred by refusing to reopen plaintiff's previous applications (Dkt. No. 12 at 4-5); (2) on the subject of plaintiff's physical condition, the ALJ erred by giving greater weight to the opinions of non-examining doctors than to that of treating physician Dr. Graves (Dkt. No. 12 at 6-8); (3) the ALJ erred by not finding that plaintiff suffers from a severe mental impairment (Dkt. No. 12 at 8-11); (4) the ALJ erred by finding plaintiff not to be credible (Dkt. No. 12 at 11-14); (5) the ALJ failed to develop the record regarding plaintiff's alleged fibromyaligia (Dkt. No. 12 at 14-16); and (6) the ALJ erred by failing to elicit testimony from a vocational expert (Dkt. No. 12 at 14-16).

### A. Previous Applications

Prior to her current application, plaintiff applied for SSI benefits on November 2, 1987 (T. at 105-108), March 26, 1997 (T. at 109-110), November 18, 1997 (T. at 111-114), and September 4, 1998 (T. at 115-117). Each of these applications was denied at the initial level of review. (T. at 63-78.) Plaintiff did not request reconsideration or an ALJ hearing regarding any of those decisions.

Plaintiff filed her current SSI application on November 3, 1999, alleging that she became disabled on October 21, 1987. (T. at 118-119.) The ALJ noted that, as result of the alleged 1987 onset date, plaintiff "by implication indicated that she wants to reopen the prior determinations."

(T. at 16.) The ALJ found "no reason or good cause ... to reopen the ... prior unfavorable determinations." (T. at 16.)

Plaintiff argues that the Commissioner erred by failing to reopen her earlier applications for SSI benefits. (Dkt. No. 12 at 4-5.) Plaintiff's argument is without merit. This Court lacks jurisdiction to review the ALJ's refusal to reopen the previous decisions:

> The Commissioner's decision not to reopen a prior determination is not a final decision for the purposes of § 405(g) and thus is generally unreviewable even if there was a hearing in the case ... (F)ederal courts may review the Commissioner's decision not to reopen a disability application in two circumstances ... If the Commissioner reviews the entire record and renders a decision on the merits, the earlier decision will be deemed to have been reopened, and ...the claim is subject to judicial review. Judicial review is also permissible in rare circumstances when the Secretary's denial of a petition to reopen is challenged on constitutional grounds ... (I)n the absence of either constructive reopening or a constitutional claim, the district court lacks jurisdiction to review a decision not to reopen.

*Byam v. Barnhart*, 336 F.3d 172, 180 (2d Cir. 2003) (citations omitted).

Here, neither of the exceptions to the general rule apply. The ALJ did not constructively reopen the earlier applications by reviewing the entire record. Rather, he discussed only the evidence arising after the rejection of plaintiff's previous claim on November 30, 1998. (T. at 15-21.) Plaintiff does not argue that she was denied due process. Therefore, this Court does not have jurisdiction to review the decision not to reopen plaintiff's previous applications.

### B.     Treating Physician

Plaintiff argues that the ALJ erred in failing to accord controlling weight to the opinion of Dr. Graves, her treating physician. Plaintiff further asserts that the ALJ failed to provide good reasons for not assigning Dr. Graves's opinion controlling weight. Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by

10

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (2001); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). Moreover, the applicable regulations require the Social Security Administration "to explain the weight it gives to the opinions of a treating physician." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.")). "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78-79.

According to the record, Dr. Graves saw plaintiff once on June 15, 2000, and issued a progress note. (T.463-70). The ALJ fully recounted Dr. Graves's progress note dated June 15, 2000 in the decision. (T. 18). Dr. Graves, however, offered no opinion regarding plaintiff's limitations. Since there was no opinion to weigh in the first instance, plaintiff's argument that the ALJ should have accorded Dr. Graves's opinion controlling weight is without merit.

### C. Mental Impairment

Plaintiff argues that the Commissioner erred by failing to find that she suffers from a severe mental impairment. (Dkt. No. 12 at 8-11.) The Court concludes that the Commissioner's finding that plaintiff does not suffer from a severe mental impairment is based on legal error and is not supported by substantial evidence.

Regarding plaintiff's mental impairments, the ALJ's decision stated that:

> [C]laimant has been assessed with recurrent depression and kleptomania, as well as possible impulse control disorder and antisocial personality disorder. The claimant's doctors, however, did not make clear how severely the claimant was limited by these conditions. Dr. Falci indicated that the claimant had some mental

11

> limitations including limitations in recent memory, insight, and judgement (sic); however, he found the claimant capable of performing limited work. Moreover, the record reflects that medication helps the claimant to manage her mental condition, which weakens her claim that her mental condition limits her ability to work. Additionally, Dr. Noia suspected that malingering might be involved in the claimant's case, which further indicates that the claimant's mental condition might be less severe than alleged.
>
> In addition to these factors, the State agency assessments indicate that the limitations caused by the claimant's mental condition did not constitute a "severe" impairment. In the Psychiatric Review Technique form, the State agency physician indicated that the claimant had a "severe" mental impairment. However, the limitations for the claimant in the B criteria of the Psychiatric Review Technique form indicate that the claimant's mental condition was not severe. Considering these factors, as well as the overall record, the undersigned finds that the claimant does not have a mental impairment, either singly or in combination, that has more than a minimal effect on the claimant's ability to perform work-related activities. Specifically, the undersigned finds that the claimant's mental condition causes only "slight" limitations of social functioning and "seldom" deficiencies of concentration, persistence, and pace.

(T. at 18-19.)

Essentially, the ALJ found that plaintiff does not suffer from a "severe" mental impairment because (1) her treating physicians "did not make clear how severely the claimant was limited by (her) conditions" and opined that she was capable "of performing limited work"; (2) Dr. Noia opined that plaintiff may be malingering; (3) the Psychiatric Review Technique form indicated that plaintiff's mental impairment was not severe; and (4) plaintiff's "condition has been made more manageable with medication." Each of these bases is flawed.

The ALJ misapplied the legal standard when evaluating the evidence from plaintiff's treating physicians and giving controlling weight to Dr. Noia's opinion. The medical opinions of a treating physician are given "controlling weight" as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with

12

other substantial evidence contained in the record. 20 C.F.R. § 404.1527(d)(2) (2007).

"An ALJ who refuses to give controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004). These factors include: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2) (2007).

The Regulations require the Commissioner's notice of determination or decision to "give good reasons" for the weight given a treating source's opinion. 20 C.F.R. § 404.1527(d)(2) (2007). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999); *Halloran,* 362 F.3d at 32-33.

When evidence from a treating source is inadequate for the Commissioner to determine whether a claimant is disabled, the Regulations require the ALJ to fully develop the record by recontacting the physician to request additional information. 20 C.F.R. § 404.1512(e) (2007). The ALJ's duty exists even when a claimant is represented by counsel. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).

The ALJ did not correctly apply the legal standard. The ALJ did not give controlling weight to plaintiff's treating physicians, who opined that plaintiff suffers from kleptomania and obsessive compulsive disorder. Rather, the ALJ heavily credited the opinion of consulting examiner Dr. Noia, who opined that plaintiff may be malingering. The ALJ's decision does not discuss any of the relevant factors and does not give "good reasons" for rejecting the treating

13

physicians' opinions.  Moreover,  the ALJ noted that Dr. Falci did "not make it clear how severely the claimant was limited by (her) conditions", but did not contact Dr. Falci for more information or for clarification of the statement that plaintiff was capable of "limited" work.

The ALJ also erred by relying on the ambiguous Psychiatric Review Technique form to find that plaintiff does not suffer from a severe mental impairment.  ALJs are required to use

> a special technique at each step of the administrative review process when a claimant suffers from a mental impairment. At step two ... the ALJ must rate the degree of functional limitation resulting from the claimant's mental impairment(s) to determine whether they are "severe."  For this purpose, the claimant's limitations in four broad functional areas are rated along a five-point scale ranging from no limitation to extreme limitation. The four areas (often referred to as the "B criteria") are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. A ranking of no or "mild" limitation in all of these areas would generally warrant a finding that the claimant's mental impairments are not severe ... If the claimant is found to have a severe impairment not listed in the Appendix, then, at steps four and five, the ALJ must assess the claimant's mental RFC .

*Rosado v. Barnhart,*  290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003)(citations omitted).

Here, as the ALJ correctly noted, the Psychiatric Review Technique form was ambiguous. It found that plaintiff suffers from only slight limitations in two of the "B criteria".  As noted above, this would "generally warrant" a finding that plaintiff's mental impairments are not severe. Yet the state agency physician who examined plaintiff as a medical consultant found that a severe impairment *was* present and that an RFC assessment was necessary.  The ALJ did not clarify this ambiguity.  Without clarification, the form cannot constitute substantial evidence that plaintiff does not suffer from a severe mental impairment.

Finally, the ALJ's finding that "medication helps the claimant to manage her mental condition" is not supported by substantial evidence.  The only evidence in the record regarding

14

the beneficial effects of plaintiff's medication is in Dr. Falci's November 1, 1999, notes and his December 1, 1999, report to the agency. The notes show that although plaintiff "felt calmer" on certain medications, she continued to obsess and suffer from an urge to steal. (T. at 466.) The report states that plaintiff's mood is "calm when in compliance with medication" but does not note any improvement in plaintiff's attention span, recent memory, insight or judgment. (T. at 280.)

Accordingly, remand for further proceedings is warranted. If, on remand, the Commissioner finds that plaintiff suffers from a severe mental impairment, the Commissioner should consult a vocational expert at step five rather than relying on the Grid. *Dwyer v. Apfel*, 23 F. Supp. 2d 223, 229-230 (N.D.N.Y. 1998); *Sanchez v. Barnhart,* 329 F. Supp. 2d 445, 449 (S.D.N.Y. 2004).

**D.    Credibility**

Plaintiff argues that the ALJ erred in finding her complaints of disabling pain and depression not fully credible. Since the ALJ's analysis of plaintiff's credibility intertwined plaintiff's alleged pain and depression, and the Court is remanding this action for further proceedings with regard to plaintiff's mental impairment, it follows that the ALJ may decide to further develop the record regarding his assessment of plaintiff's credibility.

**E.    New Evidence**

Plaintiff submitted a number of new medical documents to the Court and asserts that the Court should remand this matter in light of this "new and developing" evidence. Plaintiff further argues that based on these documents, the ALJ should have developed the record with regard to whether she suffers from fibromyalgia. These documents include physician statement forms from

Dr. Graves, dated from January 17, 2002 to September 6, 2002, that plaintiff can not engage in any activity because she suffers from fibromyalgia, "cervical radiculopathy, carpel tunnel syndrome, and depression", a consultation report dated July 2, 2002, following an MRI of plaintiff's spine, and a report of electromyography and nerve conduction studies dated December 17, 2001. The ALJ issued his decision on March 15, 2001. Thus, all the documents post-date the ALJ's decision. The Appeals Council denied plaintiff's request for review on January 25, 2002.

The court may remand a matter and "order additional evidence to be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Lisa v. Secretary of Health and Human Services*, 940 F.2d 40, 43 (2d Cir.1991) (internal quotation marks omitted) (emphasis in original) (quoting 42 U.S.C. § 405(g)); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir.1988). There are three requirements that must be satisfied in order for a court to order the Commissioner to consider additional evidence:

> An appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and ... (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently. Finally, claimant must show (3) good cause for [his] failure to present the evidence earlier.

*Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) (internal quotation marks and citations omitted).

In this case, even assuming the physician statement forms from Dr. Graves are new, and that plaintiff has good cause for failing to present the evidence earlier because they post-date (or were issued just days before) the decision of the Appeals Council, they are not material because

they contain only Dr. Graves's conclusory statement that plaintiff cannot engage in any activity; indeed, the statements contain no explanation or opinion about plaintiff's physical or functional limitations. Thus, they provide no basis upon which to conclude that they might have influenced the Commissioner to decide plaintiff's application differently. Moreover, the consultation report dated July 15, 2002, regarding the MRI of plaintiff's cervical spine does not appear to contains any new information or suggest significant changes which might have influenced the Commissioner's decision. Finally, the report of electromyography and nerve conduction studies regarding plaintiff's neck and left wrist is dated December 17, 2001, more than one month prior to the decision of the Appeals Council. However, plaintiff, who was represented by council at the time, offers no explanation why this evidence was not submitted to the Appeals Council. Thus, plaintiff has failed to show good cause for not submitting it earlier. In any event, plaintiff has not indicated, nor is it apparent from the report, that this evidence might have altered the Commissioner's decision.

### F. Fibromyalgia

As a final matter, plaintiff argues in her brief that "the evidence shows" that the ALJ failed to "contain further testing and treatment records from [Dr. Graves] to determine whether Fibromyalgia was a disabling condition in this case." By statute, the ALJ is required to develop the complete medical history for at least a twelve-month period prior to the date of application. *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d)(2). Dr. Graves, however, did not suggest fibromyalgia anywhere in her June 15, 2000, progress note, nor was there any basis for the ALJ to seek further evidence from Dr. Graves since she had seen plaintiff only once, at that point. Thus, plaintiff's argument is without merit.

17

## V.     CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[5] for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit, and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: March 24, 2008
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

---

[5] Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).